UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EVERETT 4 CORNERS LLC, | CASE NO. C11-1638JLR |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| KMART CORPORATION, | |
| Defendant. | |

This matter came before the court for a bench trial on February 19-21, 2013. Plaintiff Everett 4 Corners LLC ("Everett") was represented by Mr. Abraham Lorber and Mr. David Hosenpud; Defendant Kmart Corporation ("Kmart") was represented by Mr. Amit Ranade and Mr. George Kresovich. The presentations by both counsel were professional and of high quality. The court has considered the testimony presented at trial, the exhibits admitted into evidence, and the arguments of counsel. The court has weighed the testimony, exhibits, and evidence using the required "preponderance of the

ORDER- 1

evidence" standard. Now, being fully advised, the court makes its Findings of Fact and Conclusions of Law as follows:

## I. FINDINGS OF FACT

### A. Admitted Facts

The parties admit the following facts:

1. The real property at issue in this case is known as the "Andersons Shopping Center" and is located off Evergreen Way in Everett, Washington ("the Property"). Kmart sold the Property to Everett on September 25, 2000. In December, 2000, Kmart leased certain land and improvements from Everett (the "2000 lease") for a term of 25 years with several optional five year renewals subject to a Reciprocal Easement and Operating Agreement ("REOA"). (Pretrial Order (Dkt. # 46) ¶ 1.)

2. Section 4.01 of the REOA makes Everett responsible for maintenance of the drives and parking areas. Kmart is required to reimburse Everett for Kmart's pro rata share of the common area maintenance ("CAM") expenses. (*Id.* ¶ 2.)

3. The parties' mutual course of dealing never included preparing, submitting, or reviewing CAM budgets. Rather, Everett would invoice Kmart monthly for its pro rata share of the CAM expenses and Kmart would pay those expenses. (*Id.* ¶ 3.)

4. The REOA sets forth a different procedure if the parties do not approve a CAM budget. In that case, the REOA says that CAM charges of more than $2,000.00 can be passed along to Kmart only if Everett obtains Kmart's written consent before incurring those expenses. The one exception to this rule is if Everett proceeds under Section 4.02 (xi) of the REOA. That section authorizes recovery of CAM expenses that

constitute "emergency expenditures," defined as "all reasonable expenditures . . . [expended] in order to rectify or mitigate any condition that imposes a real and immediate risk to person or serious and irreparable damage to property." (*Id.* ¶ 4; Plaintiff's Ex. 5 at 241.)

5. During the term of the lease, employees of Kmart and Sears Holdings (Kmart's owner) took several actions related to the parking area, apparently in the belief that Kmart was responsible for maintenance of this area, including the following:

    a. Beginning in 2006, Patrick Graden, the district facilities manager for Sears Holdings, inspected the parking area every three months. In 2007, having observed cracks up to two inches deep in the asphalt and from ½ to ¾ inches wide (referred to as "alligatoring"), he completed a "Future Project Form" for major maintenance of the parking lot to take place in 2007. (Pretrial Order ¶ 5.)

    b. In 2007, Jorge Belda, Major Maintenance Property Manager for Sears Holdings, agreed that the "asphalt is in really bad shape" and noted that it needed "crack filling, pothole repair, and striping." He prepared a Major Maintenance Future Project Evaluation Form and estimated that the project would cost $150,000. Kmart ultimately abandoned the parking lot repairs in 2007 and opted to focus on "life safety" issues and "trip areas." Mr. Belda agreed that the potholes and pavement settling are trip hazards for customers and could cause vehicle damage. The parking lot pavement rehabilitation was subsequently shifted to budget year 2008 with an estimated cost of $250,000. (*Id.*)

    c. In 2010, Mr. Graden was alerted to several potholes at the northeast entrance of the Property parking lot by Kmart store manager Joe Katter. Mr. Graden had no discussions with Everett's principal Arthur Walker or Everett's agent Tom Murphy regarding the potholes. Over a period of three months, the potholes combined to become one pothole at least five feet across and at least six feet long and four to five inches deep. Mr. Graden acknowledged that cars could hit it and be damaged. Mr. Graden attempted to fix this pothole using 60-pound bags of Cold Patch asphalt. When that effort failed, Mr. Graden hired a contractor to replace 7,152 square feet of asphalt. Mr. Graden noted that "[t]his is a safety issue . . .," justifying the benefit of repair as "[s]afety of customers and associates." He indicated the alternatives were to "[d]o nothing and deal with customer complaints and safety issues" or to perform a full rehabilitation of the parking lot pavement at a cost of about $250,000. Even after the 2010 repair, Graden still observed alligatoring, cracking, and potholes. (*Id.*)

    d. In February 2011, Mr. Belda inspected the Property and filled out a visit report indicating that the parking lot was in poor condition and had cracks throughout. The Property parking lot was still an open "Future Project" in Kmart's maintenance system. (*Id.*)

  6. Since 2001, Everett has retained the services of Mr. Murphy as a consultant and construction agent to address issues relating to the Property. In March or April of 2011, Mr. Murphy met with Mr. Katter and Mr. Graden, at which time they both mentioned the poor condition of the parking lot for the first time. No one from Kmart had ever contacted Mr. Murphy about the parking lot before that time. (*Id.* ¶ 6.)

7. In a June 16, 2011, letter to Mr. Walker, Mr. Murphy described the Property parking lot as follows:

> [T]here are a number of areas that, quite frankly, are not only very unsightly but perhaps a little dangerous as well.
>
> . . .
>
> Potholes, alligators, poor seams, decaying joints, depressions, large cracks in the asphalt; all leave a very bad impression of the quality of the parking lot (and thereby the center) and will only get worse if left untreated. In some areas of the parking lot, one can still see the original asphalt laid in 1964/65.

(*Id.* ¶ 7.)

8. Mr. Katter agreed with this assessment of the parking lot's condition and agreed that it needed to be repaired. Mr. Katter walked the Property two times with Mr. Murphy prior to construction. Mr. Katter was eager to tackle the project because it needed to be done and because the remediation work would reduce the risk to patrons of tripping and falling or sustaining other injuries in the parking lot. (*Id.* ¶ 8.)

9. On June 17, 2011, Mr. Walker, on behalf of Everett, faxed and e-mailed notice to Kmart about the serious deterioration of the Property parking lot and the need for repairs. Mr. Walker included in this communication (1) site plans for the remediation, (2) a bid with a dollar amount, (3) a scope of work, and (4) a letter from Mr. Murphy outlining the repairs. (*Id.* ¶ 9.)

10. On June 28, 2011, Mr. Walker forwarded a written scope of work, a signed work order detailing the parking lot repairs it intended to undertake, and the projected cost of those repairs. Mr. Walker stated that the work would commence within a few weeks. Tammi Banaszak, who is head of Sears' common maintenance department and is

responsible for expenses and payments, forwarded Mr. Walker's letter and enclosures to Sears employee Anne O'Neill, who in turn provided the information to Sears Retail Asset Manager Daryl Penn on July 5, 2011. (*Id.* ¶ 10.)

11. On July 9, 2011, eleven days after Kmart first received Mr. Walker's notice, Mr. Penn responded to Mr. Walker acknowledging that the improvements were needed and asking for a detailed line item of the scope of work as well as a marked site plan to, among other things, determine Kmart's responsibility with respect to the cost of the improvements. Mr. Murphy notified all tenants that same day regarding Everett's intent to commence repairs to the parking lot over the next few weeks. (*Id.* ¶ 11.)

12. Everett started its paving project on or about July 18, 2011, and finished within a few days. (*Id.* ¶ 12.)

13. Mr. Walker did not respond to Mr. Penn's letter until July 25, 2011, after the parking lot repairs were completed. (*Id.* ¶ 13.)

14. Mr. Walker did not receive Kmart's written consent to proceed with the parking lot repairs before he undertook those repairs. (*Id.* ¶ 14.)

15. On July 27, 2011, Mr. Penn asked Mr. Belda and Mr. Graden to determine if the parking lot repairs were in line with the center's needs and if the expenses were reasonable. Mr. Graden stated that "All work needed to be done. That couldn't have been spread out over years." Mr. Graden and Mr. Belda agreed that the costs were reasonable in light of the size and scope of the project. Mr. Graden further advised that, during the project, workers discovered a ten foot sinkhole. Further, he advised that the area he had overlaid in the previous year was bad. (*Id.* ¶ 15.)

16. Mr. Penn admitted that the sinkhole discovered during the repairs would have been an extreme hazard to the health, safety, and welfare of patrons and vehicles. (*Id.* ¶ 16.)

17. Everett paid $181,144.87 for the property remediation and invoiced Kmart for its pro rata share in the amount of $130,723.99 on August 16, 2011. (*Id.* ¶ 17.)

**B.     Credibility Determinations**

18. Many of the witnesses who testified at trial were employees of Kmart or Sears Holdings, including Mr. Penn, Mr. Katter, Mr. Graden, and Mr. Belda. The court found these witnesses to be less credible[1] than other testifying witnesses. This is for several reasons: first, these witnesses are employees of Kmart or Sears Holdings and so may be biased in their favor. Second, many of these witnesses were successfully impeached either on cross examination, or as hostile witnesses on Everett's direct examination. These impeachments reflected witnesses who were attempting to cling to the "Kmart story." Lastly, the demeanor of the witnesses reaffirmed the court's credibility conclusions.

19. In particular, the credibility of Kmart's presentation at trial was significantly diminished by the demeanor of its main witness, Mr. Penn. Mr. Penn was impeached multiple times, once even saying "I believe that I am entitled to change my mind from this deposition on this particular page to now" after being confronted by deposition testimony that contradicted his in-court testimony. Mr. Penn was evasive and

---

[1] The court nevertheless relies on many facts testified to by these witnesses on hostile direct examination and on cross examination (often under threat of impeachment).

uncooperative as a hostile witness on direct examination and on cross, and he appeared willing to say nearly anything that he thought would frustrate opposing counsel or help his case. This severely damaged his credibility, leading the court to find him not credible. Further, his demeanor while testifying strongly suggested he was not credible.

20. The court found Mr. Walker and Mr. Murphy credible. Their answers were complete and appeared to be honest, and their demeanor and behavior led the court to conclude that they were truthful, credible witnesses. And while both Mr. Walker and Mr. Murphy stand to gain or lose from this litigation (just like Kmart and Sears employees, *see supra* ¶ 18), the court nevertheless finds that they testified with forthrightness and honesty.

21. Finally, the court found Jerry Luckenbach (the contractor who paved the parking lot) to be credible. Mr. Luckenbach was the only witness who had no interest in (or did not work for a company who had an interest in) the outcome of this litigation. Mr. Luckenbach provided what the court believes was truthful and complete testimony. Further, his demeanor led the court to find him credible.

## C. Findings Related to Whether the Project Was an "Emergency Expenditure"

22. As stated above, the REOA defines emergency expenditures as "all reasonable expenditures . . . [expended] in order to rectify or mitigate any condition that imposes a real and immediate risk to person or serious and irreparable damage to property." (Plaintiff's Ex. 5 at 241.)

23. As a result of a long period of disrepair, as of Spring 2011, the Kmart parking lot constituted both a real and immediate risk to persons and a real and

ORDER- 8

immediate risk of serious and irreparable damage to property. The following evidence supports the court's conclusion:

  a. Mr. Katter testified on February 19, 2013, that the parking lot had potholes, "alligatoring," poor seams, depressions, and large cracks. He testified that it was a trip hazard. Mr. Katter initially testified that the parking lot was not dangerous, but he was successfully impeached and eventually admitted that "there were areas of the parking lot that were a little dangerous."

  b. Mr. Graden testified that there were potholes in the parking lot and it can be a safety issue if potholes get big enough—that people can trip and cars can be damaged. He also testified that there was "alligatoring," and cracks up to 2 inches deep and ½ inch to ¼ inch wide. He testified that these cracks could catch a heel, or a toe, or a walker, and that they pose a fall danger. Just before the repaving project, Mr. Graden characterized the parking lot as a "safety issue." (*See* Plaintiff's Ex. 11 at 543.) He also stated that if Kmart were to do no repairs, it would have to "deal with customer complaints and safety issues," and that one of the benefits of the paving project would be "the safety of customers and associates." (*Id.* at 544.)

  c. Numerous witnesses testified that workers discovered a deep sinkhole on the Property during the repaving project. Testimony varied as to the exact size of the sinkhole and there is no dispute that the sinkhole was not discovered until after the repaving project began. Nevertheless, the fact that the sinkhole existed (even though it had not been discovered) provides circumstantial evidence that the parking lot was in a severe state of disrepair and posed a risk of injury and damage to property.

ORDER- 9

1    d.    In 2007, Mr. Belda assessed the parking lot and determined that, at that time, there were at least some "life safety issues" resulting from asphalt disrepair. (*See* Plaintiff's Ex. 8 at 549.) Mr. Belda could not obtain authorization to repair the entire parking lot at that time, so he performed limited repairs to address "actual life safety issues and trip areas." (*Id.* 549-51.) Based on this, the court finds that there were life safety issues and trip areas in 2007—in other words, "real and immediate risk" of harm to persons or property. That does not prove that there was a "real and immediate risk" in 2011. However, the fact that there were acknowledged life safety issues in 2007 and only the most pressing danger areas were repaired provides circumstantial evidence that, four years later, with no evidence of repairs in the meantime, the parking lot had deteriorated to the point where it posed a real and immediate risk of harm to persons and property.

e.    Numerous witnesses (including Mr. Murphy) testified that, in addition to cracks and alligatoring, there was "ponding" in certain areas of the parking lot due to poor asphalt conditions. Ponding is a condition that occurs when mud and/or silt accumulates in an area. The ponding in the Kmart parking lot created a dangerous slip hazard for customers.

f.    Mr. Belda testified that, in February 2011, the condition of the parking lot was "poor" and that it had "cracks throughout."

g.    Mr. Murphy testified that, in 2011, the parking lot showed signs of alligatoring, depressions, cracks, potholes, and silt buildup. He testified that the parking lot was dangerous and posed a particular risk to elderly and disabled persons. He

testified that, given the state of the parking lot, "it wasn't a question of if someone was going to get hurt, but when someone was going to get hurt."

        h.     In 2011, Mr. Murphy assessed the parking lot with Mr. Graden's help and determined that "in our opinion at that time, [it was] very unsafe in some areas and failing in all areas." (*See* Plaintiff's Ex. 32 at 89.) He went on to say that "[t]his evaluation was significantly substantiated when, during the pavement grinding, we uncovered a sink hole approximately 10 feet deep by 4 feet wide and growing." (*Id.*)

        i.     At trial, Mr. Murphy was asked whether there was a real and immediate risk of harm to Kmart patrons. He responded: "Yes. I believe it was a serious risk," and said that someone was going to get hurt if in fact they had not already.

        j.     Mr. Luckenbach testified that, in 2011, the asphalt was fractured, broken, and on the verge of needing to be replaced entirely (as opposed to just refurbished). In 2011, he wrote a letter to Everett explaining that, before repairs, the sidewalk had suffered from "severe fracturing in most areas and some areas with larger cracking that could have caused trip hazards or increased in size from cars continuously driving over the cracks." (*See* Plaintiff's Ex. 38 at 139.) Further, he stated that "[t]he work performed was necessary to correct and alleviate further damage and reduce the risk of injury to patrons as they visit the site." (*Id.*)

     24.     Based on the foregoing, the court finds that the danger presented by the parking lot in Spring 2011 was "real" because there was a present and substantial risk that patrons would trip or slip, fall, and injure themselves, or that potholes or other cracks would damage patrons' cars. This risk was not merely speculative. There was a

ORDER- 11

particularly acute fall risk to elderly persons or anyone using a walker or cane. The danger consisted of fragmented asphalt, cracks, silt buildup, alligatoring, and general disrepair that could cause injury or property damage. The court finds that the condition of the parking lot was such that the danger was "real" even though the poor condition of the parking lot did not cause any reported injuries on the Property before it was paved (as Mr. Katter testified on February 19, 2013).

25. The danger presented by the parking lot in Spring 2011 was "immediate" because it was already-existing as opposed to merely potential or likely to occur in the future. The parking lot already posed a risk of injury and property damage at the time the paving project occurred. The risk was no less immediate simply because the events causing the risk occurred over a long period of time and no single event (other than the passage of time) precipitated the danger. Nothing in the REOA says that a risk must develop over a short period of time in order to qualify as an emergency expenditure. The court finds that there was a real and immediate risk in 2011 notwithstanding the gradual onset of that risk.

### D. Evidence Related to Waiver and Duty of Good Faith and Fair Dealing

26. At trial, Everett presented two alternative theories for why it is entitled to damages: waiver, and breach of the duty of good faith and fair dealing. The court finds that there is sufficient evidence in the trial record to make the factual findings necessary to rule on these theories. The court is prepared to issue findings with respect to both. However, as explained below, the court declines to do so at this time. (*See infra* Conclusions of Law ¶ 8).

### E. Findings Related to Whether All Expenses Were Reasonable

27. Under the REOA, emergency expenditures are not recoverable unless they were "reasonable," and were expended to "rectify or mitigate" the dangerous condition. (Plaintiff's Ex. 5 at 241.)

28. Based on the testimony at trial, the court finds that all $181,144.87 of Everett's claimed expenses (of which Kmart's pro rata share is $130,723.99) are recoverable because they were all reasonable and were all expended to rectify or mitigate the danger posed by the parking lot's disrepair. Even Kmart's witness, Mr. Graden, stated that "[a]ll work needed to be done," and that it "couldn't have been spread out over years." (*See* Plaintiff's Ex. 26 at 73.) Mr. Graden and Mr. Belda also agreed that the costs were reasonable in light of the size and scope of the project. (Pretrial Order ¶ 15.) Indeed, Kmart seems to mostly agree with this statement: Kmart does not contest the majority of the claimed expenses—only that portion attributable to "seal coating" the asphalt.

29. The court finds that the seal coating expenses were reasonable and were expended to rectify or mitigate the danger posed by the parking lot. There was a lot of testimony about seal coating at trial. Several witnesses testified that seal coating was merely cosmetic and was unrelated to rectifying danger, but other witnesses testified that seal coating is essential to prolong the life of the pavement and keep the parking lot safe for years to come. These witnesses testified that it would be pointless to pave a parking lot but not seal coat it because, without seal coating, Kmart could easily have the same problem again a few years down the road. The court credits the testimony of those

witnesses who concluded that seal coating was a necessary part of this project and an expense that could not reasonably have been avoided. Accordingly, the court finds that seal coating was a reasonable expense that was expended to rectify the danger posed by the parking lot's disrepair and that it is therefore recoverable under the REOA.

## II. CONCLUSIONS OF LAW

The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it involves citizens of different states and the amount in controversy exceeds $75,000.00. Washington law governs.

1. Under the REOA, Kmart had a duty to reimburse Everett a pro rata share of reasonable CAM emergency expenditures. (Plaintiff's Ex. 5 at 241.)

2. Paving Kmart's parking lot in July, 2011, was an emergency expenditure because, for the reasons explained above, the condition of the parking lot presented a real and immediate risk to persons and property. (*See supra* ¶¶ 22-25.)

3. Therefore, Kmart had a duty to reimburse Everett a pro rata share of reasonable expenditures related to the July, 2011, parking lot resurfacing.

4. All $181,144.87 of the money Everett spent resurfacing Kmart's parking lot was reasonable and was expended to mitigate the emergency, as detailed above. (*See supra* ¶¶ 27-29.) Kmart therefore had a duty to reimburse Everett a pro rata share of its expenditures in the amount of $130,723.99.

5. Kmart is liable to Everett in the amount of $130,723.99 because Kmart breached its duty to Everett by refusing to pay this amount, Everett suffered $130,723.99 in damages, and Kmart's breach caused those damages.

6. Everett is entitled to 12 percent pre-judgment interest running from September 16, 2011 (the date the CAM expenses came due), because Everett's damages are a liquidated sum that can be computed with exactness. *See Austin v. U.S. Bank of Wash.*, 869 P.2d 404, 415 (Wash. Ct. App. 1994); RCW 19.52.010.

7. Everett is entitled to reasonable attorney's fees and costs in accordance with the express terms of § 11.07 of the REOA, which authorizes a prevailing party to collect "actual attorney's fees" and costs. (Plaintiff's Ex. 5 at 253.)

8. Everett presented alternative theories of (1) waiver and (2) breach of the duty of good faith and fair dealing. The court has enough evidence before it to rule on those issues but declines to do so because the emergency expenditures issue settles the case.

### III. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court DIRECTS the clerk to enter judgment in favor of Plaintiff for $130,723.99 plus pre-judgment interest, attorney's fees, and costs. By separate pleading, Plaintiff shall file a motion to determine the amounts of interest, fees, and costs within 15 days.

Dated this 1st day of March, 2013.

JAMES L. ROBART
United States District Judge